2026-116

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

IN RE TESLA, INC.,
*Petitioners*.

Petition for a Writ of Mandamus to the
United States Patent and Trademark Office,
Patent Trial and Appeal Board in
Nos. IPR2025-00943, IPR2025-00944, IPR2025-01034, IPR2025-01035

## AMICUS CURIAE BRIEF OF UNIFIED PATENTS, LLC IN SUPPORT OF PETITIONERS' PETITION FOR A WRIT OF MANDAMUS

Jonathan Stroud
Kelly Hughes
Unified Patents, LLC
4445 Willard Avenue
Suite 600
Chevy Chase, MD 20815
(202) 805-8931
(720) 352-1807

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 27(a)(3) and 47.4, counsel for amicus curiae Unified Patents, LLC certifies the following:

1. **Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Unified Patents, LLC

2. **Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

The following are parent corporates for Unified Patents, LLC: UP HOLDCO INC., Unified Patents Holdings, LLC, Unified Patents Acquisition, LLC, Unified Patents Management, LLC.

No publicly held companies own 10% or more stock in Unified Patents.

4. **Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

**5.** **Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6.** **Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

December 8, 2025

*/s/ Jonathan Stroud*
Jonathan Stroud

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i
TABLE OF CONTENTS ........ iii
TABLE OF AUTHORITIES ........ iv
INTEREST OF AMICUS CURIAE ........ 1
I. INTRODUCTION ........ 2
II. THE MAJOR QUESTIONS DOCTRINE ........ 3
A. Mandamus is needed ........ 3
1. Tesla raises a clear and indisputable right to review ........ 3
2. Tesla has no other adequate means of obtaining relief ........ 5
3. The writ is appropriate under the circumstances ........ 6
B. The Office's non-statutory denials violate the Constitution's separation of powers under the major questions doctrine ........ 8
1. The Office's non-statutory denials have vast economic and political significance ........ 8
2. Congress made no clear statement granting the Office authority to give itself non-statutory denial power. ........ 13
III. CONCLUSION ........ 17
CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS ........ 19
CERTIFICATE OF SERVICE ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerin Medical Inc v. Neurent Medical Ltd*,
IPR2025-01124, Paper 14 (PTAB Nov. 6, 2025)....7

*Almendarez-Torres v. U.S.*,
523 US 224 (1998)....17

*Am. School of Magnetic Healing v. McAnnulty*,
187 U.S. 94 (1902)....4

*Apple v. Vidal*,
63 F. 4th 1 (Fed. Cir. 2023)....6

*Burlington Northern and Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)....15

*City of Arlington, Tex. v. FCC*,
569 U.S. 290 (2013)....3, 17

*Cuozzo Speed Techs., LLC v. Lee*,
579 U.S. 261 (2016)....5

*Dart v. U.S.*,
848 F.2d 217 (D.C. Cir. 1988)....4

*Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*,
563 F.3d 1205 (11th Cir. 2009)....16

*Mylan Laboratories v. Janssen Pharmaceutica, NV*,
989 F.3d 1375 (Fed. Cir. 2021)....6, 7

*In re SanDisk*,
No. 2025-152....2

*SAS Institute Inc. v. Iancu*,
584 U.S. 357 (2018)....5, 15

*Snap Inc. v. Nokia Techs. Oy*,
IPR2025-01014, Paper 9 (PTAB Oct. 31, 2025)....7

*TankLogix, LLC v. SitePro, Inc.*,
PGR2025-00060, Paper 26 (PTAB Nov. 20, 2025) ....................7

*In re United States*,
463 F.3d 1328 (Fed. Cir. 2006) ....................6

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014)....................13

*In re Vivint*,
14 F. 4th 1342 (Fed. Cir. 2021) ....................14

*West Virginia v. EPA*,
597 U.S. 697 (2022)....................3, 8

*Whitman v. Am. Trucking Assns., Inc.*,
531 US 457 (2001)....................14

*Yates v. United States*,
574 U.S. 528 (2015)....................16

**Statutes**

7 U.S.C. § 706(1) ....................4

35 U.S.C. § 311(a) ....................13

35 U.S.C. § 311(b) ....................13

35 U.S.C. § 311(c) ....................13

35 U.S.C. §312(a)(1)....................11

35 U.S.C. § 314(a) .................... 2, 4, 6, 14-16

35 U.S.C. § 314(c) ....................4, 7, 13, 14, 15

35 U.S.C. § 314(d) ....................4, 5

35 U.S.C. § 315....................13, 15, 17

35 U.S.C. § 315(d) ....................13, 15

35 U.S.C § 316 (a)(2)....................7

35 U.S.C. § 325(d) ........................................................................13, 15

**Other Authorities**

153 Cong. Rec. H10270 (Sep. 7, 2007) ...............................................9

157 Cong. Rec. H4480 (Jun. 23, 2011) ...............................................12

157 Cong. Rec. S1348 (Mar. 8, 2011) ...............................................12

157 Cong. Rec. S1360 (Mar. 8, 2011) ...............................................12

Brian J. Love, *Inter Partes Review as a Shield for Technology Purchasers: A Response to Gaia Bernstein's The Rise of the End-User In Patent Litigation*, B.C. L. Rev., 1075 (2015) ...............................................10

Charles Duan, *On the Appeal of Drug Patent Challenges*, 72 Am. U. L. Rev. 1177, 1193 (2023) ...............................................10

H.R.112-98- America Invents Act, 112th Congress (Jun. 1, 2011) ..................12, 16

House Event 115813, Oversight of the U.S. Patent and Trademark Office, 12 (Apr. 27, 2023), www.congress.gov/118/chrg/CHRG-118hhrg52123/CHRG-118hhrg52123.pdf ...............................................11

Joseph Walker, *Drug-Industry Rule Would Raise Medicare Costs*, The Wall Street Journal (Aug. 31, 2015) ...............................................11

*Patent Trial and Appeal Board on the US Economy* (Jun. 2020), https://www.perrymangroup.com/media/uploads/report/perryman-an-assessment-of-the-impact-of-the-american-invents-act-and-patent-trial-and-appeal-board-on-the-us-economy-06-25-20.pdf .......................10

S.2220, 118th Cong. (2024), https://www.congress.gov/bill/118th-congress/senate-bill/2220...............................................11

S. Rep. 110-259, The Patent Reform Act of 2007, 110th Cong. (Jan. 24, 2008) ...............................................12

USPTO, *Setting and Adjusting Patent Fees During Fiscal year 2020* (Aug. 3, 2020), https://www.federalregister.gov/documents/2020/08/03/2020-16559/setting-and-adjusting-patent-fees-during-fiscal-year-2020#page-46993 .......... 7

## INTEREST OF AMICUS CURIAE[1]

Unified Patents, LLC is a membership organization dedicated, inter alia, to deterring non-practicing entities ("NPEs"), particularly patent assertion entities ("PAEs"), from extracting nuisance settlements based on litigation leverage from operating companies based on patents that are likely invalid. Unified has over 3,000 members, including Fortune 500 companies, start-ups, crypto platforms, automakers, medical device manufacturers, retailers, cable companies, banks, financial services companies, open-source software developers, U.S. manufacturers, and others dedicated to reducing the drain that baseless patent litigation has on the U.S. economy.

Unified studies the business models and practices of PAEs, monitors ownership data, secondary-market patent sales, demand letters, post-issuance proceedings, and patent litigation. Unified also files post-issuance challenges against patents it believes are unpatentable or invalid. Thus, Unified seeks to deter the assertion of objectively poor-quality patents.

[1] This brief accompanies a motion for leave. Fed. R. App. P. 29(b)(2). No parties' counsel authored this brief in whole or in part; neither party nor party counsel contributed money that was intended to fund preparing or submitting the brief; no person other than the amicus curiae or its counsel contributed money that was intended to fund preparing or submitting the brief. Fed. R. App. P. 29(a)(4).

## I. INTRODUCTION

Tesla posits that IPR is on the brink of extermination. This isn't exaggeration, but a certainty, unless the Court intervenes. The Office's assumption of expansive non-statutory powers in defiance of Congress's grant of defined statutory powers on a matter of economic and political significance violates the Constitution's separation of powers.

The Office claims power it does not have. The Office leans on 35 U.S.C. § 314(a), which states what the Office may *not* do, to declare that it *may* do whatever it wants. But § 314(a) limits—not expands—the Director's discretion. And it certainly does not permit the Office to fundamentally rewrite the AIA.

Amicus commented on *In re SanDisk*, No. 2025-152, which also raised constitutional concerns. Here, we address the economic and political significance of the Office's non-statutory denial scheme under the major questions doctrine, a subcategory of the separation of powers jurisprudence that Tesla raises.

Mandamus is not just appropriate; it is the only means to prevent ongoing harm from these *ultra vires* actions. Given the thousands of proceedings affected and the speed and severity of effect, only mandamus can mitigate further harm from these actions to Tesla and others defending patent lawsuits implicating, altogether, billions of dollars. This Court is the only place parties can reasonably seek relief.

## II. THE MAJOR QUESTIONS DOCTRINE

Under the major questions doctrine, courts are reluctant to interpret statutes to delegate decisions of vast "economic and political significance to an agency" using vague, subtle, or cryptic terms. *West Virginia v. EPA*, 597 U.S. 697, 729-30 (2022) (citing, e.g., *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)); *see also id*. at 735 (Gorsuch, J., concurring and summarizing). As Tesla points out, the AIA framework created by Congress is "at the heart of … the national economy." Pet. at 17. The doctrine is especially applicable here, where an agency tries to enact policies that Congress itself considered and declined. *West Virginia*, 597 U.S. at 731.

Section II.B.1 shows that the Office's non-statutory denial scheme has vast economic and political significance. Section II.B.2 shows that Congress never gave the Office such power. But first, Amicus addresses why mandamus is the only adequate means to address the Office's snowballing rewrite.

### A. Mandamus is needed

#### 1. Tesla raises a clear and indisputable right to review

An agency's "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 296 (2013). The "presumption of judicial review is particularly strong

where an agency is alleged to have acted beyond its authority." *Dart v. U.S.*, 848 F.2d 217, 223 (D.C. Cir. 1988).

Here, the Office claims an unqualified discretion to deny timely, meritorious petitions for its own, new reasons that Congress never authorized it to consider. Because the Office's actions are *ultra vires,* this Court has jurisdiction to address the Office's actions independent of even the APA; "[o]therwise the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law." *Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (pre-APA decision upholding jurisdiction over claim that a postmaster acted *ultra vires*). The Office's claim of absolute "discretionary" authority to contradict the statute thus creates a clear and indisputable legal right of review.

Tesla's petition is not a run-around of 35 U.S.C. § 314(d) for at least two reasons. First, Tesla is not asking this Court to compel the Office to institute review. Rather, Tesla asks only for a decision that complies with the requirements of the AIA. For example, a written opinion addressing the threshold question under § 314(a) is a ministerial duty of the Office required under § 314(c)—one that Tesla paid for. While § 314(d) bars *review* of a statutory-compliant decision whether to institute, under 7 U.S.C. § 706(1), this Court may (and should) ensure that institution decisions comply with requirements imposed by the AIA and the Constitution.

Second, notwithstanding § 314(d), "judicial review remains available consistent with the Administrative Procedure Act to ensure that the Patent Office does not exceed its statutory bounds." *SAS Institute Inc. v. Iancu*, 584 U.S. 357 (2018). Additionally, any "shenanigans" are reviewable to set aside "agency action that is contrary to constitutional right, in excess of statutory jurisdiction, or arbitrary [and] capricious." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 275 (2016). Here, the Office has acted far outside its statutory bounds, in ever-shifting, conflicting ways, all evincing intent to frustrate Congress' statutory plan. If these aren't shenanigans, it's hard to imagine what would be.

### 2. Tesla has no other adequate means of obtaining relief

Tesla has no other adequate means to attain the relief that it desires, i.e., basic consideration of its petitions under the explicit statutory framework. The *potential* availability of a collateral challenge in district court cannot resolve the imminent, concrete, and irreparable harm that Tesla faces from the Office's unconstitutional practices now. They are capable of repetition, yet evasive of review—the deadline to refile its petitions will have passed by the time any case could make its way through the courts. Alternative avenues cannot prevent the loss of "the applicability of a lighter burden of persuasion to prevail in challenging a patent claim than the

burden applicable in district court." *Apple v. Vidal*, 63 F. 4th 1, 13 (Fed. Cir. 2023).[2] Thus, the Office's non-statutory denial scheme presents "concrete and imminent harm that cannot be remedied after the fact." *In re United States*, 463 F.3d 1328, 1338 (Fed. Cir. 2006).

**3. The writ is appropriate under the circumstances**

If the Office's non-statutory denial scheme is not shenanigans worthy of mandamus review, Amicus struggles to think of what *would* be extraordinary enough. The Office's non-statutory scheme has cost stakeholders some ten million dollars in filing fees alone to date, and they have forced the institution rate down to nearly 0%.

Tesla's petition is distinguishable from other recent denials of mandamus review related to so-called § 314(a) denials because it raises important separation of powers questions. But even to the extent the Court feels it is bound by previous decisions to deny mandamus relief, such as *Mylan*, *en banc* review is appropriate to provide clearer guidance on the availability of mandamus for PTAB denials. *Mylan Laboratories v. Janssen Pharmaceutica, NV*, 989 F.3d 1375 (Fed. Cir. 2021). For example, while *Mylan* stressed the importance of the availability of mandamus in the denial of IPRs (*id*. at 1380), it denied the mandamus petition on the grounds that

---

[2] And not everyone who is denied an IPR will have standing to challenge the framework. *See generally id*.

petitioner had "no right for its petition to be considered without reference to the Teva litigation and no right to an IPR." *Id*. at 1383. If *Mylan* meant that no one has a right for a paid-for petition to be considered under the AIA and existing regulations, this seems incorrect under 35 U.S.C. §§ 314(c) and 316(a)(2), and correction may be necessary. Regardless, the inquiry there focused on APA concerns, while Tesla presents "colorable constitutional claims." *Id*. at 1382.

Further, the *Mylan* panel could not have possibly foreseen the Office's use of its non-statutory denial scheme to effectively repeal the AIA. Recently, the Director started issuing mass decisions that provide no written explanation other than, recently, that they are being denied for non-merits reasons. *Snap Inc. v. Nokia Techs. Oy*, IPR2025-01014, Paper 9 (PTAB Oct. 31, 2025) (denying 13 petitions without explanation); *Aerin Medical Inc v. Neurent Medical Ltd*, IPR2025-01124, Paper 14 (PTAB Nov. 6, 2025) (denying 21 petitions without explanation); *TankLogix, LLC v. SitePro, Inc.*, PGR2025-00060, Paper 26 (PTAB Nov. 20, 2025) (denying 56 cases for unspecified "discretionary considerations"). The Director's summary refusal of 90 petitions in less than a month earned the Office over $2.1 million in non-refundable fees, all for *not* doing the job Congress created the PTAB to do.[3]

---

[3] These fees are supposed to be tied the work a PTAB panel would normally do analyzing the petition and explaining their decision. *See, e.g.*, USPTO, *Setting and Adjusting Patent Fees During Fiscal year 2020* (Aug. 3, 2020), https://www.federalregister.gov/documents/2020/08/03/2020-16559/setting-and-

Given the stakes and strict statutory deadlines, many petitioners simply cannot afford to let these schemes fester while challenging the Office' actions in district court.

### B. The Office's non-statutory denials violate the Constitution's separation of powers under the major questions doctrine

The Office's non-statutory denial scheme fails under the major questions doctrine. This doctrine requires clear authorization from Congress to adopt an "expansive construction" of a statute in regulating issues of economic and political significance. *West Virginia*, 597 U.S. at 721, 716. Tesla has shown how the Office's non-statutory denial framework lacks any statutory support, let alone clear statutory support. When the Office construes its so-called discretionary authority broadly enough to cut off nearly all review, the implications are significant; it cannot continue to rely on implicit authority.

#### 1. The Office's non-statutory denials have vast economic and political significance

Under the Office's current non-statutory denial scheme, the Office frequently denies petitions even if only a single non-statutory discretionary factor is implicated, such as time-to-trial. The Office has also claimed that it need not consider the merits

---

adjusting-patent-fees-during-fiscal-year-2020#page-46993 (increasing pre-trial fees due to the "amount of time spent per case pre-institution.").

of the petition at all—it maintains it can deny meritorious challenges without reason, and has. This has vast economic and political implications.

The denial scheme is economically significant, as Congress has recognized. When the Patent Reform Act, the AIA's predecessor, was introduced, representatives observed the economic benefits of removing weak patents. One representative estimated that the value of intellectual property "amounts to $5 trillion, and much of that is in the value of the patents." 153 Cong. Rec. H10270, H10271 (Sep. 7, 2007). Representatives believed that the new review process would reduce assertions of weak patents in questionable lawsuits that "hurt the economy." *Id*. at H10272; *see also* H10282 ([T]he "creation of a post grant procedure at the Patent Office will help direct some conflicts away from court to an administrative remedy, hopefully saving vast resources in time and money."); H10284 (lamenting "baseless claims of infringement" and nuisance settlements that "sapp[ed] billions from economic growth"). Another representative observed that patent licensing "contributes approximately $150 billion to our annual economy" and opined that the reform was "the most important economic legislation that this House will pass." *Id*.

Congress was right—AIA trials *have* had a major economic impact. For example, from 2014 to 2019 alone, cost savings associated with PTAB/AIA trials resulted in over $2 billion due to fewer patent lawsuits and lower costs per case. The Perryman Group, *An Assessment of the Impact of the America Invents Act and the*

*Patent Trial and Appeal Board on the US Economy* (Jun. 2020), https://www.perrymangroup.com/media/uploads/report/perryman-an-assessment-of-the-impact-of-the-american-invents-act-and-patent-trial-and-appeal-board-on-the-us-economy-06-25-20.pdf.

The economic impact is significant even for downstream consumers. For example, IPRs provide "a substantial benefit to downstream technology purchasers and other relatively small entities faced with infringement claims," for large and small/medium sized companies alike. Brian J. Love, *Inter Partes Review as a Shield for Technology Purchasers: A Response to Gaia Bernstein's The Rise of the End-User In Patent Litigation*, B.C. L. Rev., 1075 (2015), https://bclawreview.bc.edu/articles/576/files/63ad8134d54da.pdf. In the healthcare context, IPRs have accelerated access to affordable, lifesaving medical treatments. Charles Duan, *On the Appeal of Drug Patent Challenges*, 72 Am. U. L. Rev. 1177, 1193 (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4406404. Price reductions from faster access to generics resulted in cost savings as high as 97% for cardiovascular treatments and essential prostate cancer medications. *Id*. at 1203-05. Indeed, when Congress considered rules for limiting access to AIA trials just for drug patents—a small subset of challenges—the Congressional Budget Office estimated that the proposed legislation would result in a $1.3 billion increase in

federal spending alone over the period of a decade. Joseph Walker, *Drug-Industry Rule Would Raise Medicare Costs*, The Wall Street Journal (Aug. 31, 2015).

The Office's actions have already had a concrete, immediate economic impact. According to the Office's Patent Trial and Appeal Case Tracking System ("P-TACTS"), the Office has issued 437 non-merits denials this year, charging over **$10 million** in filing fees for those non-merits decisions, the vast majority of which have fallen under the non-statutory denial framework.[4] 35 U.S.C. §312(a)(1).

This is also an issue of obvious political significance. Congress has repeatedly declined to enact legislation to restrict access to IPRs with provisions less extreme than the Office's current corpus.[5] And when the Office proposed rules to codify discretionary denials in 2023, Congress immediately held a hearing in which one representative noted that the "proposal to shorten the 315(b) deadline" using trial dates "clearly contradicts the text of the AIA." House Event 115813, Oversight of the U.S. Patent and Trademark Office, 12 (Apr. 27, 2023), www.congress.gov/118/chrg/CHRG-118hhrg52123/CHRG-118hhrg52123.pdf.

The sheer level of public participation on this issue also confirms its political significance. When the Office sought comments for the less-extreme ANPRM in

---

[4] Recently, the Office has stopped providing its basis for denials, so Amicus cannot know how many of recent denials rely on its non-statutory scheme.

[5] *See, e.g.*, S.2220 - 118th Congress (2023-2024): PREVAIL Act, S.2220, 118th Cong. (2024), https://www.congress.gov/bill/118th-congress/senate-bill/2220.

2023, it faced significant backlash from the public in the form of over 14,000 comments over 60 non-holiday days (the vast majority of which, some 95%, were in opposition). Last week, the Office received over 11,000 comments over 45 days that included the Thanksgiving holiday on its recent attempt to bar PTAB challenges and district court defenses in excess of statutory parameters. While Amicus and others are still reviewing them, the comments again appear overwhelmingly negative. Given the tremendous response to attempts at formal rulemaking, the political significance of the non-statutory denial scheme cannot be denied.

The Office's non-statutory denial scheme undermines the purpose of AIA trials to serve as "quick and cost effective alternatives to litigation." H.R. Rep. 112-98 - America Invents Act, 112th Congress, 48 (Jun. 1, 2011) ("H.R.112-98"); *see also* S. Rep. 110-259, The Patent Reform Act of 2007, 110th Cong. (Jan. 24, 2008) (IPR is "a quick, inexpensive, and reliable alternative to district court litigation"); 157 Cong. Rec. S1360, S1376 (Mar. 8, 2011) ("Among the reforms that are expected to expedite these proceedings [is] the shift from an examinational to an adjudicative model"). Congress directed these proceedings to the PTAB as "more likely to reach the correct decision on a technical question compared to a jury composed of laypeople." 157 Cong. Rec. S1348, S1350 (Mar. 8, 2011). Supporters also emphasized the need for these trials to curtail assertion of "frivolous or questionable patents" by "the trial lawyer lobby and patent trolls." *See* 157 Cong. Rec. H4480,

H4495 (Jun. 23, 2011). AIA trials have significant political significance on the patent system, as evidenced by enthusiastic public participation and the legislative history, and the Office's efforts to eliminate them requires clear Congressional authorization.

### 2. Congress made no clear statement granting the Office authority to give itself non-statutory denial power.

Because of its "vast 'economic and political significance,'" courts "expect Congress to speak clearly" in giving the Office the power to implement its non-statutory denial scheme. *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014). It did not.

In the AIA, Congress identified who may petition for inter partes review (35 U.S.C. § 311(a)), what grounds they may raise (35 U.S.C. § 311(b)), and when they may file (i.e., 35 U.S.C. § 311(c) and 35 U.S.C. § 315). Congress required the Office to issue a written institution decision that addressed the threshold reasonable-likelihood question. 35 U.S.C. § 314(c). Congress permitted the Director to stay or terminate proceedings based on concurrent proceedings or certain previous challenges before the Office. 35 U.S.C. § 315(d); 35 U.S.C. § 325(d).

Absent from the AIA is a provision inviting the Office to create *its own* rules for further denying timely, meritorious petitions—whether based on perception problems or any other whim of the agency. Instead, Congress created a specific time-bar after rejecting a status-based standard (*see infra*).

The Office construes the word "may" in § 314(a) as its authority for absolute discretion. However, "permissive language alone, does not render a question committed to agency discretion," let alone *absolute* discretion. *In re Vivint*, 14 F. 4th 1342, 1351 (Fed. Cir. 2021). Rather, that language must be read in context with other words and provisions in the statute. That textual context is key here—it is the word "not." Section 314(a) isn't about what the Director's power *is*; it's about what the Director's power *isn't*.

Unless the Office identifies some other provision clearly granting it the authority it claims, the application of the major questions doctrine stops here: the Office's claim of expansive authority from its exegesis of this negative provision simply is untenable given the economic and political implications that such an interpretation has.

However, the Court may go further to note that the Office's expansion of § 314(a) is wrong as a matter of basic statutory construction. As an initial matter, "Congress … does not hide elephants in mouseholes." *Whitman v. Am. Trucking Assns., Inc.*, 531 US 457, 468 (2001). It is unreasonable to interpret § 314(a) as giving the Office authority to rewrite this subsection to refer to anything other than the merits.

Additionally, another subsection of the same provision, § 314(c), *requires* the Director to provide parties with written notice of its "determination under subsection

(a)," where "[s]uch notice shall include the date on which the review shall commence." 35 U.S.C. § 314(c). The Office has assumed that the "determination" of § 314(c) refers to the decision whether to institute, but it is incorrect as a matter of syntax: "determination" here refers to § 314(a), which refers to whether the petition is reasonably likely to prevail with respect to at least one claim. Contrast this with subsections (b) and (d), which explicitly reference a determination "whether to institute." We must presume that "Congress has acted intentionally and purposefully" in phrasing these subsections differently. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006).

Other provisions in the AIA, and the organization of the AIA itself, also rebut the Office's claim that it has the power to limit access to AIA trials based on the status of district court proceedings. These other sections are important in understanding the limited scope of § 314(a), for "[j]ust as Congress' choice of words is presumed to be deliberate and deserving of judicial respect, so too are its structural choices." *SAS Institute*, 584 US at 364 (internal quotations omitted).

For example, the Office's interpretation renders other provisions of the statute, including much of Section 315, pointless. Under this section, provisions permit the Director to terminate, stay, or consolidate a proceeding based on a related *Office* proceeding. 35 U.S.C. § 315(d); *see also* 35 U.S.C. § 325(d). Courts resist readings of statutes that "would render superfluous an entire provision passed in

proximity as part of the same Act," as the Office's reading of § 314(a) does to §§ 315 and 325. *Yates v. United States*, 574 U.S. 528, 543 (2015).

Where, as here, "Congress knows how to say something but chooses not to, its silence is controlling." *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009). Instead of giving broad authority to the Office to consider district court proceedings, Congress chose to set a specific, time-based limit on the Office's authority—the one-year bar of § 315(b), while being silent as to district court time-to-trial. Congress's silence on discretionary authority based on the timing of concurrent *district court* cases while giving express discretionary authority for concurrent *Office* proceedings is therefore a powerful indicator that Congress never meant to give the Office such authority.

The Office must respect Congress's choice not to bestow discretionary denial authority based on district court cases. Congress considered, and rejected, tying institution to the status of litigation, as some complained that the one-yar bar would be *too short*, imposing an "extremely compressed schedule that will not provide enough time" for petitioners in complex cases. H.R. 112-98, 164–65. Ultimately, Congress settled on the one-year deadline. The Office's creation of an earlier deadline based on a tentative trial date[6] undermines this bipartisan compromise.

[6] Trial date was the only factor the Office explicitly cited to deny review. However, all of the *Fintiv* factors are non-statutory.

Ultimately, if Congress wanted to give the Director the ability to consider trial dates, they would have put it the section entitled "Relation to other proceedings or action" (§ 315); that Congress didn't resolves any doubt about whether such authority exists. *See Almendarez-Torres v. U.S.*, 523 US 224, 234 (1998). The Office's assumption that broad power was implied not only in a single word stripped of context, but where no one would have expected it, ignores that "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington*, 569 US at 296.

Read together, the logical read of these provisions (along with § 316(a)(2)) is that the Office will commence trial if (1) a petition met the reasonable-likelihood threshold, (2) the petition was not otherwise barred, and (3) the Office declined to deny based on discretionary principles explicitly outlined by Congress. The Office's claims otherwise require a re-writing of the AIA, which only Congress can do.

## III. CONCLUSION

Nothing in the AIA allows the Office to overwhelmingly deny timely, meritorious petitions for non-statutory reasons. The Office must know petitioners will not throw hundreds of thousands of dollars at a near-zero chance to be heard. That is, perhaps, their goal. This is what clear-statement doctrines like the major questions doctrine aim to stop. The Office's claim to such unbridled power violates the Constitution. Mandamus is the appropriate means of redress.

Respectfully submitted,

December 8, 2025

By: */s/ Jonathan Stroud*
Jonathan Stroud
jonathan@unifiedpatents.com
Unified Patents, LLC
4445 Willard Ave., Suite 600
Chevy Chase, MD 20815

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

1. This brief complies with the type-volume limitation of Fed. Cir. R. 21(e). It contains 3,861 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2. This amicus brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

December 8, 2025

*/s/ Jonathan Stroud*
Jonathan Stroud

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 8, 2025, I caused to be electronically filed the foregoing AMICUS CURIAE BRIEF OF UNIFIED PATENTS, LLC IN SUPPORT OF PETITIONERS' PETITION FOR A WRIT OF MANDAMUS using the Court's CM/ECF filing system.

I certify that all counsel of record in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. *See* Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).

December 8, 2025

*/s/ Jonathan Stroud*
Jonathan Stroud